PHILIP COGAN and CECILE COGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JACK BURCHILL and REGINA BURCHILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cogan v. Commissioner
Docket Nos. 5789-74, 5790-74.
United States Tax Court
T.C. Memo 1980-328; 1980 Tax Ct. Memo LEXIS 259; 40 T.C.M. (CCH) 1032; T.C.M. (RIA) 80328; August 20, 1980, Filed Martin D. Cohen and Harvey R. Poe, for the petitioners. Gerald J. O'Toole, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Docket
Taxable
Petitioners
No.
Year
Philip & Cecile Cogan
5789-74
1968
Philip & Cecile Cogan
5789-74
1969
Philip & Cecile Cogan
5789-74
1970
Jack & Regina Burchill
5790-74
1968
Jack & Regina Burchill
5790-74
1969
Jack & Regina Burchill
5790-74
1970
Income Tax
Addition to Tax
Petitioners
Deficiency
Sec. 6653(b) [1]
Philip & Cecile Cogan
$ 5,274.44
$6,152.21
Philip & Cecile Cogan
5,540.00
2,770.00
Philip & Cecile Cogan
10,857.00
5,429.00
Jack & Regina Burchill
$ 5,306.50
$2,653.25
Jack & Regina Burchill
911.50
455.75
Jack & Regina Burchill
7,884.33
3,942.17
*260 The cases were consolidated for trial, briefs and opinion. Petitioners have conceded the deficiencies in income tax except as to the taxable years 1969 and 1970 which are covered by an oral stipulation to be discussed below. The primary issue for determination is whether the underpayments of income tax by petitioners for each of the years involved were for the fraudulent purpose of attempting to evade tax, subjecting them to the 50 percent fraud penalty provided by section 6653(b) of the Code. The Commissioner concedes that if the returns are found to be fraudulent that petitioners-wives qualify as innocent spouses with respect to the fraud penalty. Assessment of additional income tax for the taxable years 1968 and 1969 for all petitioners is barred by the statute of limitations on assessment unless we find that the income tax returns for those years were fraudulent. FINDINGS OF FACT Some of the facts were stipulated. The stipulation of facts and exhibits are incorporated by reference. Petitioners Philip Cogan and Cecile Cogan are husband and wife and they resided in Pompton Lakes, New *261 Jersey, when they filed their petition. The filed their Federal income tax returns for the taxable years 1968, 1969 and 1970 with the District Director of Internal Revenue at Newark, New Jersey. Petitioners Jack Burchill and Regina Burchill are husband and wife and they resided in East Paterson, New Jersey, when they filed their petition. They filed their Federal income tax returns for the taxable years 1968, 1969 and 1970 with the District Director of Internal Revenue at Newark, New Jersey. Petitioners-husbands (hereinafter referred to as Cogan and Burchill) were, during the years here involved, equal partners in a business named Industrial Products Co. (hereinafter referred to as I.P.C.). It was engaged in the purchase and sale of electronic parts, tools, dies and other industrial supplies. Some of the customers of I.P.C. during the years involved were Bendix Corporation, Curtiss-Wright, Western Electric, General Dynamics, Todd Shipyards, I.T.T., Crompton & Knowles and Walter Kidde. 4368. The Supreme Court also stated at n. 7: (Forms 1065) for the taxable years involved with the District Director of Internal Revenue at Newark, New Jersey. I.P.C. was a sole proprietorship *262 of Cogan engaged in the mill supply business until Burchill became his partner in 1965. During the years involved Cogan operated an X-ray business located near I.P.C. and, although Cogan maintained no office at I.P.C., he visited the I.P.C. offices from time-to-time and communicated with Burchill by telephone. The signatures of both Cogan and Burchill were required on checks issued by I.P.C. Most of the sales made by I.P.C. were by invoice and payment by check. Burchill actively conducted the business of I.P.C. and he consulted with Cogan from time-to-time. During the years involved, I.P.C. maintained checking accounts at the Prospect Park National Bank, Prospect Park, New Jersey and the First National Bank of Passaic County, Paterson, New Jersey. Both of the banks were a considerable distance from I.P.C. but a bank in which I.P.C. had no account or safe deposit box was located across the street from I.P.C.
I.P.C. sold taps, dies, drills and industrial cutting tools manufactured by Vermont Tap & Die Co. (hereinafter referred to as Vermont) which was located in Lyndonville, Vermont. It was one of the major suppliers of I.P.C. The sales of such products in the New York *263 City area were very competitive. Prior to mid-1968 the sales of Vermont's products suffered because its competitors maintained warehouses in the New York City area which enabled them to quickly deliver their products to customers whereas all of Vermont's deliveries were shipped by rail from Lyndonville, Vermont.Vermont and Burchill, therefore, agreed that Vermont could compete more effectively if I.P.C. were designated as a master distributor of Vermont's products and the I.P.C. warehouse would be stocked with sufficient inventories to insure more prompt deliveries of Vermont's products. Under the distributorship arrangement Vermont agreed that I.P.C. would receive a basic discount of 42 percent and an additional discount of 10 percent. At about the time that I.P.C. and Vermont entered into the master distributorship arrangement, General Dynamics Corporation placed an order with I.P.C. whereby I.P.C. would furnish all of General Dynamic's requirements for taps of a certain type. Such an order would produce annual sales between $150,000 and $200,000. I.P.C. agreed to give General Dynamics a discount of 60 percent off list price and Vermont agreed to give I.P.C. a basic discount *264 of 60 percent and an additional discount of 10 percent. I.P.C. received orders from other customers such as Todd Shipyards, I.T.T., Crompton & Knowles and Walter Kidde. The size of the discount varied with each customer and the corresponding discount which I.P.C. received from Vermont varied. Vermont and I.P.C. agreed to account for the discounts in the following manner: Vermont would bill the sales of all merchandise to I.P.C. at a discount of 42 percent plus 10 percent. At the end of the each month I.P.C. would send Vermont copies of all invoices reflecting sales of Vermont's merchandise which I.P.C. sold to its customers. From the invoices submitted, Vermont would calculate the additional discount due to I.P.C. each month and mail I.P.C. a check for that additional discount. During 1968, 1969 and 1970 Vermont mailed to I.P.C. 31 checks for additional discount, aggregating $159,094.44. Three of the checks were deposited in the checking account of I.P.C. at Prospect Park National Bank. They were the following: check No. 36340 dated October 10, 1969, for $5,648.93; check No. 36795 dated November 18, 1969, for $6,864.18; and check No. 40046 dated August 27, 1970, for $4,619.84. *265 The remaining 28 checks aggregating $141,961.49 were not deposited to any bank account. Instead, Burchill called Cogan when each check was received. Cogan came to the I.P.C. office, they both endorsed the check and Cogan cashed the check at the Prospect Park National Bank some 15 to 20 minutes from the I.P.C. office. Cogan returned to the I.P.C. office with the cash and he and Burchill divided it equally between themselves. The discounts represented by the 28 checks were not recorded on the books and records of I.P.C. nor were they reflected on the U.S. Partnership Returns of Income (Forms 1065) filed by I.P.C. The procedure had the effect of overstating the cost of goods sold of I.P.C. in the amounts of $36,488.63 in 1968, $50,418.97 in 1969 and $55,053.89 in 1970. Burchill deposited some of his half of the proceeds of the Vermont discount checks in his personal savings account. Cogan placed all of his half in his personal safe deposit box at a bank near his home. The procedure utilized by Burchill and Cogan with respect to the Vermont discount checks was unique in the I.P.C. business. All of the other checks received by I.P.C. were deposited by mail to one of the banks *266 in which I.P.C. maintained a checking account. From time to time Burchill purchased merchandise for I.P.C. for cash from an individual named Ralph Cagan, who operated under the business name of R. C. Cagan Sales. Cagan typically called Burchill to advise him that he had a large lot of surplus merchandise for sale. These lots generally exceeded a value of $5,000 and were made available to I.P.C. at very low prices. Some of the merchandise purchased from Cagan was sold by I.P.C. at a gross profit margin of 100 percent. Cagan accepted only cash for his sales to I.P.C. When Burchill received a call from Cagan as to the availability of merchandise, he called Cogan to advise him of the cost of the merchandise. Cogan would then deliver to Burchill one-half of the cost of the merchandise from the cash in his safe deposit box which came from the Vermont discount checks. Burchill paid the other half of the cost in cash from his share of the Vermont discount checks. Burchill and Cogan utilized the proceeds from the Vermont discount checks to purchase merchandise for I.P.C. from Cagan in the following amounts: Year
Amount
1968
$12,500
1969
52,000
1970
30,500
*267 Burchill made no purchases from Cagan after February 25, 1971. I.P.C. was purchased on or about that date by a publicly held corporation which did not permit cash purchases of merchandise. Burchill was unable to locate Cagan after he ceased making purchases from him. The books and records of I.P.C. were maintained by an individual named Sal Pollina. He also prepared the partnership returns and income tax returns of petitioners. Pollina died approximately three years prior to the trial of this case. Neither I.P.C., Burchill nor Cogan maintained records to reflect the amounts of the Vermont discount checks which were cashed, nor did any of them maintain records reflecting the disposition of the proceeds of those checks. Neither Burchill nor Cogan directed any employee of I.P.C. to record the proceeds of the Vermont discount checks on the books and records of I.P.C.
The Commissioner, in his statutory notices of deficiency mailed to petitioners, determined that petitioners received additional net shares of I.P.C. partnership income represented by the difference between the Vermont discount checks and the proceeds represented by such checks used to purchase merchandise from *268 Cagan as follows: Taxable
Vermont
Purchases
Additional
Taxable to
Year
Discounts
From Cagan
I.P.C. Income
Each Partner
1968
$ 36,488.63
$12,500.00
$23,988.63
$11,994.32
1969
62,932.08
52,000.00
10.932.08
5,466.04
1970
59,673.73
30,500.00
29,173.73
14,586.87
$159,094.44
$95,000.00
$64,094.44
$32,047.23
The Commissioner also determined that all or a part of the underpayment of tax for each of the taxable years was due to fraud, subjecting petitioners to the 50 percent fraud penalty prescribed by section 6653(b) of the Internal Revenue Code of 1954. At trial counsel for respondent advised the Court that counsel for the parties had stipulated that all 31 checks from Vermont had been cashed by petitioners but counsel discovered later that 3 of the checks were deposited into the checking account of I.P.C. with the result that the deficiencies for two of the years would be recomputed. The concession by respondent at trial results in revised amounts as follows: Taxable
Vermont
Purchases
Additional
Taxable to
Year
Discounts
From Cagan
I.P.C. Income
Each Partner
1968
$ 36,488.63
$12,500.00
$23,988.63
$11,994.32
1969
50,418.97
52,000.00
none
none
1970
55,053.89
30,500.00
24,553.89
12,276.94
$141,961.49
$95,000.00
$48,542.52
$24,271.26
*269 OPINION Petitioners-husbands Cogan and Burchill were equal partners in I.P.C. which sold various items of industrial tools, electronics parts and supplies. Vermont, one of its suppliers, allowed varying discounts to I.P.C. for large sales of Vermont's products by I.P.C.Vermont and I.P.C. agreed that Vermont would allow a flat discount on all orders by I.P.C. and an additional discount payable monthly by check from Vermont to I.P.C. based upon invoices for sales made by I.P.C. to be submitted monthly to Vermont. During the years involved Vermont mailed 31 discount checks to I.P.C., only 3 of which were recorded on the books and records of I.P.C. and which were conceded to be reflected in the U.S. Partnership Returns of Income (Forms 1065) filed by I.P.C. The remaining 28 checks were endorsed by Cogan and Burchill, cashed by Cogan, and the proceeds divided equally. Cogan put his half of the proceeds in his personal safe deposit box and Burchill deposited some of his half in a personal savings account. From time to time Burchill purchased merchandise on behalf of I.P.C. for resale from Cagan Sales. The purchases were for cash and at very low prices. During 1968, 1969, and *270 1970 he paid $95,000 for such merchandise and it was paid for equally by Cogan and Burchill from their respective shares of the proceeds from the Vermont discount checks which they diverted from I.P.C.
Petitioners conceded the deficiencies in income tax for the taxable years 1968, 1969, and 1970; however, assessment of additional taxes for the taxable years 1968 and 1969 are barred by the statute of limitations on assessment unless we find that the income tax returns for those years were fraudulent. The burden of proving fraud is upon respondent for all three taxable years. Sec. 7454(a), I.R.C. 1954; Rule 142(b), Tax Court Rules of Practice and Procedure. Fraud is never presumed. It must be affirmatively established by clear and convincing evidence. Beaver v. Commissioner, 55 T.C. 85 (1970). Direct evidence of fraud is seldom available and whether it exists must be determined from the conduct of the taxpayer and surrounding circumstances.
Fraud consists of two elements; i.e., an underpayment of tax and the fraudulent intent to attempt to evade *271 payment of the tax. Petitioners here have conceded that they underpaid their income taxes for each of the taxable years 1968, 1969 and 1970. The only question remaining, therefore, is whether the underpayments occurred with the accompanying fraudulent intent to evade payments of the tax. "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941). The issue of fraud is one of fact to be ascertained from the entire record. The "consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." Schwarzkopf v. Commissioner, 246 F.2d 731, 743 (3d Cir. 1957). In the instant case, Petitioners Cogan and Burchill each understated their respective income by $11,994.32 in 1968; $5,466.04 in 1969; and $14,586.87 in 1970. All of the understatements were the result of a single scheme to divert discounts paid by a supplier to their partnership, I.P.C.
Respondent allowed as offsets to the diversted funds $95,000 which were used to make cash *272 purchases of merchandise. Nevertheless, Burchill and Cogan could hardly be given credit for knowing how much was offset against the diverted discounts because they admittedly maintained no records. Nor did they even produce the partnership records to the Internal Revenue Service or in Court. At time of trial they offered nothing to demonstrate that they were under threat of criminal prosecution. Cf. Singleton v. Commissioner, 606 F.2d 50 (3d Cir. 1979), affg. per curiam 65 T.C. 1123 (1976), and a Memorandum Opinion of this Court. The burden of proof of respondent in proving fraud may be met with circumstantial evidence. Powell v. Granquist, 252 F.2d 56, 61 (9th Cir. 1958); Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. per order 578 F.2d 1383 (8th Cir., May 2, 1978). Such circumstantial evidence includes conduct calculated to mislead or conceal. Beaver v. Commissioner, supra, at 92-93. Such evidence also includes arranging "affairs to avoid making the records usual in transactions *273 of the kind." Spies v. United States, 317 U.S. 492, 499 (1943). Petitioners openly admitted that they diverted the Vermont discount checks from the partnership. They attempted to explain away this concealment of income (or reduction of cost of sales) by contending that if they entered it on the partnership books and records and deposited it in a partnership bank account, they would be tempted to buy inventory with it which would not produce the large profit margins that inventory purchased from Cagan and other cash distributors would produce. We do not believe this testimony. The testimony of Burchill was more detailed than that of Cogan and understandably so because he conducted the day-to-day operations of I.P.C. Nevertheless, he was very vague in many respects and completely unconvincing as a witness. We do not believe his testimony or that of Cogan as to their purpose for diverting the discount checks from Vermont. They did not keep the proceeds of the diverted checks intact. Instead they divided them equally as equal partners divide profits. Each reduced his one-half to his own possession and either put the cash in a safe deposit box (Cogan) or deposited *274 part in a savings account (Burchill). Those funds were no longer partnership funds; they were distributions from the partnership. When they needed funds to purchase merchandise from Cagan the funds they used were contributions to the partnership. If Burchill and Cogan wanted to set aside funds to use for cash purchases which might be needed on short notice, they chose the most difficult way to do it. They divided it and took it away to two distant locations and put it in banks when there was a bank across the street from I.P.C. The half that Cogan kept earned no income and part of Burchill's earned interest income because it was in a savings account. If the funds were still owned by the partnership, half of them sat idle while Burchill was concerned about profit margins and Burchill personally benefited from earning interest on part of the funds he held. This hardly sounds like the operations of two mature, successful businessmen. No records were maintained whatsoever. Burchill testified that the funds were later used by the partnership to buy merchandise from Cagan and others and to reimburse him for lavish entertainment of customers in New York City and at the Super Bowl *275 in Miami. He stated that he could provide no receipts because the entertainment was of a type for which you could not obtain receipts, yet he claimed to have chartered a yacht in Miami for $3,000. We do not believe his testimony. He furnished the names of no one whom he entertained nor did he produce any witnesses to corroborate his testimony. Interstate Circuit v. United States,306 U.S. 208 (1939); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). It is true that the burden of proof was on respondent and because the taxable years 1968 and 1969 were closed for assessment except for fraud, respondent went forward with his proof, calling petitioners-husbands as witnesses. When respondent rested, petitioners moved for summary judgment which was denied because there was a genuine issue of material fact; i.e., fraud. Rule 121 (b), Tax Court Rules of Practice and Procedure. Petitioners then moved to strike respondent's affirmative allegations for lack of proof which was denied. Counsel for petitioners then characterized his motions as motions to dismiss. The rulings *276 on petitioners' motions implied that respondent had made a prima facie case because petitioners then called a character witness, an employee of I.P.C. to corroborate the testimony of Burchill as to deliveries of merchandise from Cagan after normal working hours and then called Burchill to reiterate some of the story he related on direct examination. The burden of going forward having shifted to petitioners they offered no convincing proof that the funds were not diverted with the intent to evade tax. One former employee testified that she observed merchandise on hand which had not been in the warehouse when she left the previous evening and she saw Burchill counting large sums of money correlating in time to Cagan's visits. Petitioners requested that we find as facts that Burchill made cash purchases from the diverted funds from suppliers other than Cagan and that the funds were used for entertainment. This we decline to do because we find Burchill untrustworthy as a witness and his testimony is in no way corroborated except by Cogan, also a petitioner. If Burchill were unable to obtain receipts for entertainment, nothing prevented him from maintaining records of what he spent, *277 when he spent it and for whom. We will not buy a "pig in a poke." Based upon the totality of the record and our observations of the demeanor of the witnesses, we hold that respondent has sustained his burden of proving by clear and convincing evidence that the income tax returns of petitioners for the taxable years 1968, 1969 and 1970 were filed with fraudulent intent. Accordingly, we approve imposition of the addition to tax under section 6653(b) of the Code with the result that the period of limitations on assessment had not expired when the Commissioner mailed statutory notices of deficiency to petitioners. The time for assessment of additional tax for the taxable years 1968 and 1969 has not expired. In his reply brief, respondent reneges on his concession at the beginning of the trial with respect to three of the checks from Vermont which counsel discovered to be deposited in the bank account of I.P.C. He attempts to weasel out of the oral stipulation made at the beginning of trial by observing that the fact of deposit was brought to his attention only five minutes prior to trial; that, although he agreed they were deposited, he did not agree they were reported on the partnership *278 return; and finally, that petitioners had stipulated that they did not contest the deficiencies determined by the Commissioner in his statutory notices of deficiency. The assertions in respondent's reply brief are contrary to the transcript of proceedings wherein counsel for respondent stated: [MR. O'TOOLE:] Your Honor, at this time I'd like to call to the attention of the Court that this morning Mr. Poe and I had a conference with respect to certain items on the Stipulation of Facts, and we have agreed to change them--verbally change them and to submit a supplemental stipulation correcting those items. Those items have to do with three checks that were payable to Industrial Products Company from Vermont Tap and Die Company. Those checks--Exhibit 10-J says that--that 31--those 31 checks were cashed. That's an incorrect statement. Twenty-eight of those 31 checks were cashed. Three of them were deposited into the partnership bank account. So there--this change affects several of the paragraphs and would also affect the computation for the deficiency for at least two of the years, maybe three of the years. It's a minor change as far as the computation, but it's--it hs to be *279 corrected and will be. And we have agreed to it. We granted leave to withdraw the stipulation at the conclusion of trial and substitute a new one. In his interrogation of Burchill he again conceded that three of the checks were deposited and not cashed. To permit respondent to renege on his concession at the late date of filing his reply brief would be prejudicial to petitioners. It would deprive them of the opportunity to offer proof of reporting the three checks as a reduction of cost of goods sold. Petitioners had every right to rely on the concession of respondent's counsel at trial and we will not permit respondent to withdraw his concession or attempt to modify it after trial. Therefore, the three checks described in our findings of fact which were deposited to the bank account of I.P.C. in 1969 and 1970 will reduce the unreported income determined by the Commissioner for those years for all petitioners. Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩