GARY GLASS, TRANSFEREE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Glass v. Commissioner
Docket Nos. 5529-86; 5530-86; 27170-86.
United States Tax Court
T.C. Memo 1988-550; 1988 Tax Ct. Memo LEXIS 579; 56 T.C.M. (CCH) 764; T.C.M. (RIA) 88550; December 5, 1988
Arthur Pelikow and Larry Kars, for the petitioners. Roland Barral and Jeannette D. Schmelzle, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Docket No.
Petitioner
Year Ended
Deficiency
5530-86
Three G Trading
Sept. 30, 1980
$ 1,325,876
Corp., Transferor
Sept. 30, 1981
37,588
June 30, 1982
4,276
5529-86
Gary Glass,
Sept. 30, 1980
1,325,876
Transferee
Sept. 30, 1981
37,588
June 30, 1982
4,276
27170-86
Gary Glass and
Dec. 31, 1982
298,624
Dale Glass
By amendment to answer, respondent determined that there is a deficiency due for 1982 [2] from Three *581 G Trading Corp., Transferor, and Gary Glass, Transferee, of $ 938,892, with respect to the nonapplication of section 337 [3] to the 1982 transactions involved herein, and that, under section 6621(c), part of the deficiencies for each year were substantial underpayments attributable to tax-motivated transactions so that Three G Trading Corp., Transferor, and Gary Glass, Transferee, are liable for interest on such part at 120 percent of the statutory rate. After concessions, the issues for decision are whether Three G Trading Corp. is entitled to deduct certain losses incurred in trading commodity futures contracts during 1980, and, if so, whether it is required to recognize certain gain realized from trading commodity futures contracts during 1982 and whether part or all of the underpayment, if any, for 1980 is attributable to a tax-motivated transaction. [4]
*582 Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. For convenience, we have combined our findings of fact and opinion. Three G Trading Corp. (hereinafter referred to as petitioner) was a New York corporation with taxable year ending September 30, and Gary Glass and Dale Glass were residents of Merrick, New York, at the time their petitions were filed. Petitioner dissolved on June 30, 1982, pursuant to a plan of liquidation adopted on September 30, 1981. Mr. Glass was president and sole shareholder from its inception to its dissolution. All of its assets, subject to liabilities, were distributed to Mr. Glass on June 30, 1982. The parties have stipulated that Mr. Glass was transferee of petitioner for Federal income tax purposes. From December 15, 1975, through December 31, 1981, petitioner was a clearing member of the New York Mercantile Exchange (NYMEX). It had no customers, maintained no inventory of commodity futures contracts and did not engage in hedging operations. During the years in issue, Mr. Glass was a member of the Commodity Exchange, Inc. (COMEX) and NYMEX. Mr. Glass traded commodities *583 futures contracts only for petitioner during the years in issue. A commodity futures contract is a commitment to deliver or receive a specified quantity of a commodity during a designated future month. Where a person selling a commodity futures contract is obligated to deliver the commodity, it is known as a short position. Where a person buying a commodity futures contract is obligated to accept delivery, it is known as a long position. The obligation to accept or make delivery may be avoided by purchasing or selling an offsetting contract. A straddle [5] is a simultaneous holding of a long and a short position (each of which is a leg) in the same commodity for different delivery months. A long straddle is a straddle where the distant leg (that is, the leg with the later delivery month) is the long position; a short straddle is one in which the distant leg is short. A straddle has less risk than an outright position, because the prices for each leg tend to move together. The price at which the straddle trades is the differential between the prices of the two legs; prices for the individual legs are set by the traders, and under the COMEX rules must fall within the daily *584 trading range of prices for each leg. A butterfly straddle is a combination of two straddles with the middle legs, either both long or both short, in the same month. A butterfly straddle typically has less risk than a straddle. [6]
On its Form 1120 (Corporation Income Tax Return) for 1980, petitioner reported ordinary income of $ 3,237,260 and ordinary loss of $ 3,321,200, for a net loss of $ 83,940. If allowable, the loss is a capital loss. See Three G Trading Corp., Transferor v. Commissioner,T.C. Memo. 1988-131. The parties agree that the reported ordinary income represents capital gain from trading commodity futures contracts not related to the transactions *585 involved herein. Petitioner's claimed loss arose from a series of trades, including straddles and butterfly straddles, in gold futures contracts, all of which were executed on COMEX and cleared through Heinold Commodities, Inc. (Heinold). [7] All of the trades, except for the January 19, 1982 trades, were executed personally by Mr. Glass on petitioner's behalf. Each trade was entered into after open outcry on the COMEX trading floor, and prices assigned to the legs were within the limits imposed by COMEX. Each required margin, and petitioner complied with the COMEX margin requirements. On June 13, 1980, petitioner entered into the following contracts: Description
Number
Contract
Price [8]
New/Offset [9]
Sold
200
December 1981
702.00
New
Bought
400
February 1982
713.00
New
Sold
200
April 1982
724.00
New
The trader *586 opposite petitioner in each of these trades was Richard Buccellato (Buccellato), who was trading for three accounts, one of which was his own. These contracts created a butterfly straddle. On June 30, 1980, petitioner entered into the following transactions: Description
Number
Contract
Price
New/Offset
Sold
200
October 1981
756.00
New
Sold
200
October 1981
758.00
New
Bought
200
December 1981
770.00
Offset
Bought
200
April 1982
801.00
Offset
The trader opposite petitioner in each of these trades was Milton Kaufman (Kaufman). These transactions closed one of the two straddles that had made up the butterfly straddle entered into on June 13, 1980, leaving one open straddle (short 400 in October 1981 and long 400 in February 1982). Petitioner claimed a loss of $ 2,900,600 on these transactions. [10]
*587 On July 2, 1980, petitioner entered into the following transactions: Description
Number
Contract
Price
New/Offset
Bought
200
October 1981
765.00
Offset
Bought
200
October 1981
770.00
Offset
Sold
200
December 1981
784.00
New
Sold
200
April 1982
808.00
New
The trader opposite petitioner in these transactions also was Kaufman. These transactions closed the October 1981 leg of the straddle that had resulted from the June 30, 1980, transactions and put back the butterfly that had been opened on June 13, 1980. The prices of the contracts for December and April were, however, higher. Petitioner claimed a loss of $ 420,600 on these transactions, for a total loss in 1980 of $ 3,321,200. As of July 2, 1980, the settlement prices, which are the prices used to clear trades with the exchange's clearinghouse and are based on the range of closing prices for all contracts and delivery months, of the contracts making up the legs of the butterfly straddle held by petitioner were as follows: Contract
Settlement Price
October 1981
$ 778.00
December 1981
792.20
April 1982
806.40
These prices resulted in an open *588 trade equity (the sum of the products of the differences between the prices assigned to the legs and the settlement prices multiplied by the number of contracts and the number of ounces involved in each contract) [11] of $ 3,320,000. Subsequently, on November 20, 1981, petitioner entered into the following transactions: Description
Number
Contract
Price
New/Offset
Bought
200
December 1981
397.64
Offset
Sold
242
February 1982
404.32
Offset
Bought
42
June 1982
419.00
New
These transactions closed one straddle of the butterfly straddle entirely, partially closed another and opened a new straddle partially to replace the one that had been closed. Petitioner held a "tilted" butterfly -- one in which one leg has fewer contracts than the other -- at this point, because it held 158 February 1982 contracts and 42 June 1982 contracts. The net gain on the transactions was $ 256,481 in 1982. On January 19, 1982, petitioner closed out the butterfly straddle, put in place on November 20, 1981, as follows: Description
Number
Contract
Price
New/Offset
Sold
158
February 1982
379.30
Offset
Bought
158
April 1982
386.40
Offset
Bought
42
April 1982
386.50
Offset
Sold
22
June 1982
394.40
Offset
Sold
20
June 1982
394.50
Offset
*589 The net gain on these transactions was $ 3,055,400. Petitioner's overall net loss on the entire series of transactions set forth above was $ 9,319. During the period from October 1, 1979, through June 30, 1982, there were no investigations undertaken by the COMEX against either petitioner or Mr. Glass. The threshold question that we must face is whether the loss claimed by petitioner in 1980 is allowable. Section 108 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by the Tax Reform Act of 1986, sec. 1808(d), Pub. L. 99-514, 100 Stat. 2085, 2817, which we will refer to as section 108, provides in pertinent part: (a) General Rule. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions -- (1) which were entered into before 1982 and form part of a straddle * * * any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business * * *. (b) Loss Incurred in a trade or business. -- For purposes of subsection (a), any loss incurred *590 by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business. We note at the outset that, for purposes of the transactions herein, the term "dealer" has two different definitions. First, for purposes of characterizing gains and losses as capital or ordinary, a person is a dealer if he has customers. King v. Commissioner,89 T.C. 445, 458 (1987); Three G Trading Corp., Transferor v. Commissioner, supra.Second, for purposes of section 108, a commodities dealer is "a person who is actively engaged in trading section 1256 contracts and is registered with a domestic board of trade which is designated as a contract market by the Commodities Futures Trading Commission." Sec. 1402(i)(2)(B), cited in sec. 108(f). Thus, one can be a dealer for purposes of section 108 but not a dealer for the purpose of categorizing gains and losses. King v. Commissioner,89 T.C. at 459 n.6. Respondent has conceded that if section 108 applies, petitioner's losses are allowable. [12] For section 108 to apply, *591 however, petitioner must establish that the transactions were not fictitious, prearranged or in violation of the rules of COMEX. Katz v. Commissioner,90 T.C. 1130 (1988); Cook v. Commissioner,90 T.C. 975, 984-985 (1988). *592 Respondent has not asserted that any of the COMEX transactions involved herein were fictitious, that is, that they did not take place. Respondent does argue that, based on the pattern and timing of the trades, as well as the alleged fact that they did not have a profit potential, the transactions were prearranged. Petitioner argues that the testimony of the two principal persons with whom he made the trades involved herein, the place and manner in which the trades were executed, and the prices at which they were executed shows that the trades were not prearranged. Whether the transactions were prearranged is a question of fact; petitioner bears the burden of proof. Katz v. Commissioner,90 T.C. at 1136; Rule 142(a). Mr. Glass testified that he made no agreements concerning the trades at issue. We found much of his testimony, however, to be vague in several respects, particularly as to the specific reasons for entering into the straddles involved herein. Moreover, he failed to remember many details, particularly those involving asserted sanctions by the Commodities Futures Trading Commission, which respondent attempted to prove for impeachment. While we do *593 not believe that the alleged violations impeached Mr. Glass's credibility (particularly since respondent did not offer in evidence the documentary material which he used to cross-examine Mr. Glass in this respect), we are not required to accept Mr. Glass's testimony as gospel. See Fleischer v. Commissioner,403 F.2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; Leong v. Commissioner,T.C. Memo. 1977-19, affd. without published opinion 573 F.2d 1291 (2d Cir. 1977). [13] We therefore will consider the objective evidence.
At the outset, we recognize that, generally, in determining whether a commodity straddle activity was entered into for profit, consideration is given to the entire scheme. See, e.g., Glass v. Commissioner,87 T.C. 1087, 1174 (1986), affd. sub nom. Yosha v. Commissioner, F.2d (7th Cir., Nov. 8, 1988). But we are satisfied *594 that this rule is not absolute and that it does not preclude examining separate steps in a series of transactions, see 87 T.C. at 1175-1176, particularly where the issue is determining the existence of prearrangement, even though the profit objective may be one element. Although the facts that a transaction was executed by open outcry on a regulated exchange, cleared through normal channels, and priced within the daily limits imposed seem to indicate that it was not prearranged (see King v. Commissioner,87 T.C. 1213, 1217 (1986); Perlin v. Commissioner,86 T.C. 388, 416 (1986)), these elements are not determinative. [14]
*595 We find that, with respect to the June 30, 1980, and the July 2, 1980, transactions, the objective evidence is sufficient to overcome the other evidence of record that indicates that the transactions were not prearranged. Several facts influence this finding. First, all the transactions on these days were executed with Kaufman as the opposite trader. Thus, his results were an exact mirror of petitioner's. Second, from Kaufman's perspective, the transactions produced a complete wash in results (ignoring transaction costs) -- that is, the gain on the October legs is equal to the loss on the December and April legs. Similarly, if petitioner had not had the open positions from the June 13, 1980, transactions, it would have had wash results on the June 30 and July 2 transactions. To be sure, because some of the June 30 transactions offset positions from some of the June 13 transactions (the February 1982 position remained unaffected), petitioner seemingly realized a loss while being left with the potential for gain remaining in the newly acquired (December 1981 and April 1982 legs), albeit subject to the risk of the market. But the fact of the matter is that after the June 30 and *596 July 2 transactions were completed, petitioner was in the identical position in which it had been immediately prior to June 30, i.e., as it had been as a result of the June 13 transactions. Furthermore, petitioner's open trade equity was exactly equal to its claimed losses less transaction costs. Petitioner made no attempt either through Mr. Glass's testimony or on brief to deal specifically with any of these elements of the June 30 and July 2 transactions. In short, petitioner had no profit motive in entering into the June 30 and July 2, 1980, transactions and thus fails to meet the standard of Cook v. Commissioner, supra, namely that, for the purpose of section 108(b), a transaction need not be entered into primarily for profit and that a commodities dealer need only show that there was some profit potential in order to avoid the curse of "prearrangement." See 90 T.C. at 985-986. See also Yosha v. Commissioner,    F.2d   ,    (7th Cir., Nov. 8, 1988) ("A transaction not 'entered into for profit' is, at the least * * * a transaction that lacks *597 economic substance."). We view this case as reflecting the same lack of any profit motive which existed in Glass v. Commissioner, supra, and which was the foundation of our holding in Cook.
We hold that petitioner has not met its burden of showing that the June 30 and July 2 transactions were not prearranged, so that those transactions should be disregarded in determining the tax consequences of petitioner's commodity futures activity. [15]
Respondent also argues that section 108 should not apply because these trades were wash trades and they were noncompetitive. Both situations would be violations of the COMEX rules and as such would constitute an independent ground for disallowing the claimed losses. In view of our holding that the June 30 and July 2 transactions were prearranged, we find it unnecessary to resolve the question of whether any of these transactions violated the COMEX rules. With respect to 1982, respondent has conceded *598 that the gains for that year should be reduced by the losses disallowed for 1980. See Glass v. Commissioner,87 T.C. at 1177. The result of this concession is to eliminate any gain for 1982.[16] To the extent that there may be a net loss for 1982, it will not be recognized by virtue of section 337, and we do not understand that petitioner would contend otherwise. With respect to the further application of section 337 claimed by respondent, his position was predicated upon our recognition of the June 30 and July 2, 1980, transactions which respondent contends would have produced a locked-up profit to petitioner prior to the adoption of the place of liquidation on September 30, 1981 -- a profit that, according to respondent, would have constituted an assignment of income upon petitioner's liquidation and therefore without the scope of section 337. Compare Carborundum Co. v. Commissioner,74 T.C. 730, 740-742 (1980), and S. C. Johnson & Son, Inc. v. Commissioner,63 T.C. 778 (1975), with Peterson v. United States,723 F.2d 43 (8th Cir. 1983). In view of our holding that the June 30 and July 2 transactions should *599 be disregarded, this section 337 issue is mooted. We turn to respondent's determination that petitioner is liable under section 6621(c) for interest on the underpayment at 120 percent of the statutory rate. That section provides that additional interest will be due if a "substantial underpayment" is attributable to a "tax motivated transaction." Certain transactions are deemed to be "tax motivated" by section 6621(c)(3), including "any straddle." Sec. 6621(c)(3)(A)(iii). Petitioner's disallowed losses were attributable to straddles. Therefore, we find that this was a tax-motivated transactions, and respondent is entitled to additional interest on the interest accruing on the portion of the underpayment attributable to such transaction after December 31, 1984. See Patin v. Commissioner,88 T.C. 1086, 1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988). *600 To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith for trial, briefing and opinion: Three G Trading Corp., Transferor, docket No. 5530-86, and Gary Glass and Dale Glass, docket No. 27170-86.↩
2. We will refer to Three G Trading Corp.'s fiscal years by the year in which they ended. ↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Respondent has conceded that there is no deficiency due from Gary and Dale Glass in docket No. 27170-86.↩
5. The parties use the synonymous term "spread" to refer to straddle positions. Because the relevant case law and statutes use the term "straddle," we will use that term as well. See Perlin v. Commissioner,86 T.C. 388, 391↩ n.8 (1986). 6. For a more complete description of trading commodity futures contracts and the strategy thereof, see Smith v. Commissioner,78 T.C. 350, 354-357 (1982). See also Perlin v. Commissioner, supra↩ at 391-394.
7. None of petitioner's transactions executed on NYMEX are at issue.↩
8. Each contract represented 100 ounces of gold. Prices are quoted in dollars per ounce. ↩
9. This column indicates for all transactions involved herein whether the trade opened a new position or was an offset that closed a position already held.↩
10. Gain or loss is the difference between the price per ounce in the opening contract and the price per ounce in the closing contract, multiplied by the number of contracts and the number of ounces per contract. All loss and gain figures also include transaction costs, which were $ 1.50 per closed position (that is, transaction costs were paid only when offsetting a position, not when opening a new position).↩
11. For example, the open trade equity of the December 1981 leg was (784.00-792.20) x 200 contracts x 100 ounces per contract.↩
12. In his trial memorandum, respondent states "respondent will not require petitioner to prove the * * * elements of being in a trade or business of trading commodities. Consequently, if petitioner's trades were found to be bona fide (not prearranged), the losses therefrom would be allowable as incurred in a trade or business under section 108." In his brief, respondent seeks to withdraw the concession. We are not inclined to accept such withdrawal, however, as it would put petitioner at a disadvantage, since it tried and argued the case in light of the concession. Nor are we prepared to accede to respondent's attempts to extend the parties' stipulation that petitioner "was not a dealer in commodity futures contracts" to the section 108 definition. It is clear to us that this stipulation was included only as confirmation of our holding in Three G Trading Corp. v. Commissioner,T.C. Memo. 1988-131↩, that the gains and losses involved herein were capital and not ordinary and was not intended to extend to the section 108 definition of dealer. Moreover, we note that, after the stipulation was filed, respondent's counsel stood mute when, in response to a question from the Court, petitioner's counsel stated "The Respondent has conceded section 108 if the losses are held to be bona fide."
13. Petitioner's reliance on the testimony of the persons with whom he made the trade is misplaced, as neither's testimony pertained to the trades at issue herein.↩
14. Petitioner makes much of the fact that COMEX authorities neither imposed nor threatened sanctions in respect of, nor threatened sanctions during, the time period up to petitioner's liquidation. We give this fact only minimal weight in determining whether the transactions involved herein were prearranged, however, because the record does not reveal whether any such actions were taken after petitioner's liquidation or by some authority other than the exchange, e.g., the Commodities Futures Trading Commission.↩
15. As a result, there should be no adjustment for petitioner's related transaction costs nor any claim for higher cost for determining gain or loss from the subsequent closing of the December 1981 and April 1982 legs.↩
16. The net gains for 1982 were $ 3,055,400, and we have disallowed losses of $ 3,320,000 for 1980. The impact of the concession and our decision on 1981 can be accounted for in the Rule 155 computation.↩