# United States Tax Court

T.C. Memo. 2022-72

ESTATE OF WILLIAM E. DEMUTH, JR., DECEASED, DONALD L.
DEMUTH, EXECUTOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 18724-19.                                Filed July 12, 2022.

———————

*William R. Kaufman*, for petitioner.

*Kathleen K. Raup*, for respondent.


MEMORANDUM OPINION

JONES, *Judge*: The Internal Revenue Service (IRS) issued a notice of deficiency determining a deficiency in federal estate tax of $179,130. The notice was issued to Donald L. DeMuth in his capacity as the executor of the estate of his deceased father, William E. DeMuth, Jr. (decedent). Donald DeMuth filed a Petition in this Court pursuant to section 6213(a) for redetermination of the deficiency.[1]

The parties submitted this case for decision without trial under Rule 122. The sole issue for our decision is whether the value of ten checks written before but paid after decedent's death is properly includible in his gross estate. For the reasons detailed below, we hold

———————

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulatory references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*2] that seven of the ten checks are includible in decedent's gross estate.

*Background*

The following facts are derived from the Stipulation of Facts and the jointly stipulated exhibits contained therein. Decedent was domiciled in Pennsylvania when he died testate on September 11, 2015. Donald DeMuth is the executor of his late father's estate and resided in Pennsylvania when he timely filed the instant Petition.[2]

In January 2007, decedent executed a power of attorney (POA) appointing his son, Donald DeMuth, as his agent. Pursuant to the POA, Donald DeMuth was authorized to give gifts to decedent's issue in amounts not exceeding the annual exclusion from the federal gift tax.[3] From 2007 through 2014, Donald DeMuth gave annual gifts to his brothers and other family members in accordance with the POA.

Among decedent's financial assets was an investment account at Mighty Oak Strong America Investment Co. (Mighty Oak) that featured a checking function.

In the summer of 2015, decedent's health began to fail. By early September of that year, decedent was in an end-stage medical condition, and he passed away on September 11. On September 6, prior to decedent's death, Donald DeMuth wrote eleven checks, totaling $464,000, from decedent's investment account. The checks are consecutively numbered 1214 through 1224.

Of these eleven checks, however, only check No. 1216 was paid by Mighty Oak before decedent's passing. While checks Nos. 1215, 1219, and 1221 were deposited by the respective payees on September 11, seemingly before decedent's death, those checks were not paid by Mighty Oak until September 14—three days after he passed away. Thus, ten of

---

[2] While there is an unresolved issue in this Court as to whether a decedent's domicile at the time of death or the executor's place of residence is controlling for purposes of appellate venue, there is no conflict with respect to venue for appeal here as Pennsylvania was both decedent's domicile at the time of his death and Donald DeMuth's residence when the Petition was filed. *See Estate of Clack v. Commissioner*, 106 T.C. 131 (1996). Thus, absent stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the Third Circuit. *See* § 7482(b)(1)(A).

[3] In calendar year 2015, the annual exclusion was $14,000 per donee. *See* Rev. Proc. 2014-61, § 3.35(1), 2014-47 I.R.B. 860, 868.

[*3] the eleven checks (totaling $436,000) were not paid by Mighty Oak until after decedent's death. The order by which Mighty Oak paid out the eleven checks is as follows:

| Check No. | Amount | Date Paid by Mighty Oak |
|-----------|--------|-------------------------|
| 1216 | $28,000 | 09/09/2015 |
| 1215 | 28,000 | 09/14/2015 |
| 1219 | 28,000 | 09/14/2015 |
| 1221 | 14,000 | 09/14/2015 |
| 1220 | 14,000 | 09/15/2015 |
| 1224 | 240,000 | 09/16/2015 |
| 1217 | 28,000 | 09/17/2015 |
| 1218 | 28,000 | 09/17/2015 |
| 1223 | 14,000 | 09/18/2015 |
| 1214 | 28,000 | 09/25/2015 |
| 1222 | 14,000 | 09/30/2015 |
| **Total** | **$464,000** | |

On Schedule B, Stocks and Bonds, of Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, Donald DeMuth, acting in his capacity as the estate's executor, reported that the value of the Mighty Oak investment account was $442,639, which excluded the value of all eleven checks he wrote (on decedent's behalf) on September 6, 2015. The return was selected for examination and audit.

On July 18, 2019, the IRS issued a notice of deficiency, which determined that the value of the investment account (and by extension, William DeMuth's gross estate) reported on the return was understated

**[*4]** by \$436,000—the value of the ten checks that were not paid by Mighty Oak until after decedent's death.[4]

## *Discussion*

### I.   *Burden of Proof*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing that those determinations are erroneous. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Submission of a case under Rule 122 does not alter the burden of proof. *See* Rule 122(b). Accordingly, petitioner bears the burden of showing that the value of the ten checks (totaling \$436,000) that were paid by Mighty Oak after decedent's death is not includible in his gross estate.

### II.   *Legal Framework and Application*

Section 2033 provides: "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Treasury Regulation § 20.2031-5 further specifies that the "amount of cash belonging to the decedent at the date of his death, whether in his possession or in the possession of another, or deposited with a bank, is included in the decedent's gross estate." To that end, the value of any check written by a decedent that still belongs to them at their death is includible in their gross estate; however, the funds from such a check no longer belong to a decedent at their death if they executed a completed gift of the check during their life. As such, we must determine whether the checks at issue represent completed gifts.

Treasury Regulation § 25.2511-2(b) provides that a gift is not considered complete until a donor has "parted with dominion and control as to leave him no power to change its disposition." For purposes of this regulation, we must look to the relevant state law to determine when a decedent parts with dominion and control of the funds in their account after they draw a check. *See Burnet v. Harmel*, 287 U.S. 103, 110 (1932) (holding that state law creates legal interests whereas federal law determines how and when those interests should be taxed); *Estate of Dillingham v. Commissioner*, 88 T.C. 1569, 1575 (1987), *aff'd*, 903 F.2d

---

[4] Respondent also determined that the amount of adjusted taxable gifts reported on the return was understated by \$11,824 for purposes of section 2001(b)(1)(B). But respondent later conceded this determination.

**[\*5]** 760 (10th Cir. 1990). Consequently, we turn to Pennsylvania law to determine when the gift of a check is deemed complete.

Under Pennsylvania law, in order to make a valid inter vivos gift, there must be "a clear, satisfactory, and unmistakable intention of the giver to part with and surrender dominion over the subject of the gift, with an intention to invest the donee with the right of disposition beyond recall, *accompanied by an irrevocable delivery*, actual or constructive." *Packer v. Clemson*, 112 A. 107, 107 (Pa. 1920) (emphasis added). Mere delivery of a check does not complete a gift. *See In re Mellier's Estate*, 182 A. 388, 389 (Pa. 1936). This principle makes sense given that the Pennsylvania Commercial Code allows the drawer[5] of a check to "stop payment of any item drawn on [their] account or close the account by an order to the bank describing the item or account with reasonable certainty received at a time and in a manner that affords the bank a reasonable opportunity to act on it." 13 Pa. Cons. Stat. § 4403(a) (2015). Thus, so long as the drawer of a check can make a stop-payment order on that check, the delivery of the check is revocable. Although the drawer of a check may very well have the intention to invest the payee[6] with the right of disposition beyond recall, if that intention is not coupled with an irrevocable delivery, the drawer has not surrendered dominion and the gift is incomplete under Pennsylvania law. As such, our main query now is determining at what point a drawer can no longer make a stop-payment order, as that will determine the point at which the gift of a check becomes irrevocable and is therefore completed.

Though some interpretation is necessary, the Pennsylvania Commercial Code answers this specific question:

> Any . . . stop-payment order received by . . . a payor [drawee] bank *comes too late* to terminate, suspend, or modify the right or duty of the bank to pay an item or to charge the account of its customer [drawer] for the item if the . . . stop-payment order . . . is received . . . and a reasonable time for the bank to act thereon expires . . . after the earliest of the following:
>
> (1) The bank accepts or certifies the item.

---

[5] The "drawer" is the person who signs a draft (i.e., a check) or is identified as the one ordering payment. *See* 13 Pa. Cons. Stat. § 3103(a) (2015).

[6] The "payee" is the person to whom a check is payable. *See* 13 Pa. Cons. Stat. § 3110(a) (2015).

**[\*6]**         (2) The bank pays the item in cash.

(3) The bank settles for the item without having a right to revoke the settlement under statute, clearinghouse, rule or agreement.

(4) The bank becomes accountable for the amount of the item under section 4302 (relating to responsibility of payor [drawee] bank for late return of item).

(5) With respect to checks, a cutoff hour no earlier than one hour after the opening of the next banking day after the banking day on which the bank received the check and no later than the close of that next banking day or, if no cutoff hour is fixed, the close of the next banking day after the banking day on which the bank received the check.

13 Pa. Cons. Stat. § 4303(a) (2015) (emphasis added).

This statute stands for the proposition that once a check has reached any one of the aforementioned stages in its processing at the time a stop-payment order is made, then the stop-payment order is too late; at that time, a charge may be validly made against the drawer's account. Therefore, the first (but not the only) possible time at which a gift of a check may be deemed complete is when the drawee[7] bank[8] accepts, certifies, or makes final payment of the check. In this context, acceptance means "the drawee's signed agreement to pay a draft as presented." 13 Pa. Cons. Stat. § 3409(a) (2015). Similarly, for a check to be certified means that the check has been "accepted by the bank on which it is drawn." *Id.* § 3409(d).

---

[7] The "drawee" (or alternatively, "payor bank") is the person that is ordered in a draft to make payment. *See* 13 Pa. Cons. Stat. § 3103(a) (2015); *see also* 13 Pa. Cons. Stat. § 4105 (2015). In other words, the drawee is the drawer's bank; it is the entity which pulls the funds from the drawer's account in order to make final payment of a check. On the other hand, a payee deposits a check with a "depositary bank." *See* 13 Pa. Cons. Stat. § 4105. The depositary bank is not always the same entity as the drawee bank and must somehow present the check to the drawee bank for payment. *See* 13 Pa. Cons. Stat. § 4204 (2015).

[8] Brokerage firms offering checking services are considered "banks" for purposes of bank deposits and collections provisions of Pennsylvania's version of the Uniform Commercial Code. *See Nisenzon v. Morgan Stanley DW, Inc.*, 546 F. Supp. 2d 213, 224 (E.D. Pa. 2008).

**[\*7]**  In the instant case, Mighty Oak did not accept, certify, or make final payment on any of the ten checks at issue until after decedent's death.[9] Consequently, a stop-payment order could have theoretically been placed on any of those checks before final payment. Therefore, under Pennsylvania law, none of the ten checks at issue represented completed gifts prior to decedent's death.

If we could stop here, we would hold that the full value of all ten checks paid by Mighty Oak after decedent's death ($436,000) is properly includible in his gross estate.

III.   *Relevant Terms of Art*

In all matters before this Court, the use of proper terminology is of the utmost importance. In the instant case, both parties have seemingly misconstrued the term "drawee bank" to mean "depositary bank." As discussed *supra* note 7, these two terms have distinct meanings; a drawee bank is the entity ordered by the drawer to make payment whereas a depositary bank is the entity that a payee uses to deposit a check. Drawee banks are often distinct entities from depositary banks; they are not interchangeable.

The first time the parties mistakenly refer to the payees' depositary banks as drawee banks is in the Joint Stipulation of Facts; in reference to checks Nos. 1215, 1219, and 1221, the parties stipulated to the following language: "On September 11, 2015, the following Mighty Oak checks were deposited and credited to the accounts of the following payees by their respective *drawee banks*." (Emphasis added.). To be clear, those payees deposited their checks and had their accounts credited by their respective *depositary banks*, not the drawee bank. The misuse of the term "drawee bank" did not end there, however, as it was repeatedly used incorrectly in both petitioner's and respondent's

---

[9] Although the payees of checks Nos. 1215 and 1219 seemingly deposited their checks at Mighty Oak prior to decedent's death, there is nothing in the record to indicate that Mighty Oak either formally accepted or certified those checks before final payment. Since a stop-payment order could have theoretically been placed at any point up until the final payment of checks Nos. 1215 and 1219 on September 14, the gifts of those checks were not complete under Pennsylvania law until after decedent's death. The same may be said of check No. 1221, which was deposited at a different bank prior to decedent's death but was also paid by Mighty Oak on September 14. Moreover, check No. 1216 is not at issue as it was paid by Mighty Oak two days before decedent's death, and its value was not included in respondent's notice of deficiency with respect to the understatement of the Mighty Oak account.

**[\*8]** Simultaneous Opening Briefs. At no point did either party formally recognize the error or attempt to correct it.

This terminological distinction is critical in the instant case because respondent conceded (in his Simultaneous Opening Brief) that checks Nos. 1215, 1219, and 1221 were not includible in decedent's gross estate—seemingly on the basis that the checks had been "credited by drawee banks" before decedent's death.[10] As discussed previously, those checks were not, in fact, credited by the drawee bank (Mighty Oak) before decedent's death. While we cannot necessarily be certain as to the specific basis for respondent's concession, we must nevertheless acknowledge that respondent made the concession and that the concession likely stems from a misunderstanding of the terms of art.

IV.    *Respondent's Concession on Brief*

At issue now is whether or not we are to hold respondent to a concession he made on brief in the context of a case that has been submitted for decision without trial under Rule 122 when the concession is inconsistent with the applicable law. While this particular issue has seemingly never come before the Court, we have previously disallowed the Commissioner's withdrawal of a concession in the context of post-trial briefing. *See Glass v. Commissioner*, T.C. Memo. 1988-550, 1988 Tax Ct. Memo LEXIS 579, at \*12 n.12 ("In his brief, [the Commissioner] seeks to withdraw the concession. We are not inclined to accept such withdrawal, however, as it would put [the taxpayer] at a disadvantage, since it tried and argued the case in light of the concession."), *aff'd*, 904 F.2d 33 (2d Cir. 1990) (unpublished table decision); *Cogan v. Commissioner*, T.C. Memo. 1980-328, 1980 Tax Ct. Memo LEXIS 259, at \*21 ("[The taxpayers] had every right to rely on the concession of [the Commissioner's] counsel at trial and we will not permit [the

---

[10] Respondent conditioned his concession on the Court's finding that the gifts of the checks in question were made inter vivos as opposed to causa mortis; however, Pennsylvania law dictates that a causa mortis gift "differs from other gifts only in that it is made when the donor believes he is about to die, and is revocable should he survive." *In re Elliot's Estate*, 167 A. 289, 291 (Pa. 1933). Regardless of the name used to describe the gift, "the elements necessary to a complete gife [sic] are not changed. . . . In every valid gift a present title must vest in the donee, *irrevocable in the ordinary case of a gift inter vivos*; revocable only upon the recovery of the donor in gifts mortis causa." *Id.* (emphasis added) (quoting *Appeal of Walsh*, 15 A. 470, 471 (Pa. 1888)). Consequently, the distinction made by the parties between causa mortis and inter vivos gifts is improper and irrelevant.

**[\*9]** Commissioner] to withdraw his concession or attempt to modify it after trial.").[11]

*Glass* and *Cogan* both dealt with the Commissioner's attempt to withdraw concessions (which were made before and at trial) during post-trial briefing, whereas the parties here have submitted this case for decision without trial under Rule 122. Despite the difference in procedural posture, the principle remains the same. Respondent has not attempted to withdraw his concession at any point. Perhaps more importantly, however, petitioner relied upon respondent's concession regarding checks Nos. 1215, 1219, and 1221 in the drafting of his Simultaneous Answering Brief. Thus, although all ten checks at issue would otherwise be includible in decedent's gross estate under a proper legal analysis, to ignore the concession respondent made in his brief sua sponte would be prejudicial to the petitioner. We will therefore hold respondent to his concession: checks Nos. 1215, 1219, and 1221, which total $70,000, will not be included in decedent's gross estate. The remaining seven checks at issue, which total $366,000, are included in the gross estate.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we deem them to be moot, irrelevant, or without merit. To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[11] *But see Gale v. Commissioner*, T.C. Memo. 2002-54, 2002 Tax Ct. Memo LEXIS 57, at \*34–35 ("In the cases at hand, [the Commissioner] took the position that [the taxpayer] did not have receipt of the settlement proceeds in 1992 only after the trial commenced. In the notice of deficiency, [the Commissioner] took the position that the proceeds were taxable in 1992. We therefore do not elect to hold [the Commissioner] to his trial concession. However, we should ameliorate any harm to [the taxpayer] by requiring [the Commissioner] to bear the burden of proving all factual issues arising out of [the Commissioner's] change in position."). In *Gale*, the Commissioner repudiated his concession on the basis that a new Tax Court opinion (filed on the same day he filed his opening brief) supported his original position and therefore justified the repudiation. *See id.* at \*31. These facts are not present in the instant case. Consequently, *Gale* is distinguishable.